# EXHIBIT 3

*MoonShadow v. Raemisch, et al.*

# 16-cv-01717-MSK-STV

**REBUTTAL REPORT**

**Jayde Moonshadow, aka Billy Radan, #120535**

Prepared by George R. Brown, MD, DFAPA

2/5/18

## INTRODUCTION

I have been retained under contract by the Attorney General's Office, Denver, Colorado, to review the care received by the above-named inmate residing in the Sterling Correctional Facility in Sterling, Colorado, and to provide a rebuttal report regarding the expert reports submitted by Randi Ettner, Ph.D and Li Brookens, LCSW, dated 10/26/17 and 12/12/17. Dr. Ettner submitted an initial report, prior to interviewing Ms. Moonshadow, dated 7/28/17, which was also reviewed.  Documents reviewed for this report, in addition to the three expert reports, included the medical and administrative records for Ms. Moonshadow, review of the legal filings from both plaintiff and defendant attorneys (Case 1:16-cv-01717-STV and subsequent amended complaints), personal interview of the inmate, and consultation with Ms. Kathryn Starnella, Assistant Attorney General, and counsel for the defendant in this case (Colorado Department of Corrections and relevant officials). Finally, I had the opportunity to discuss this case with both her treating psychiatrist, Dr. Butler, and with Dr. Butler's supervisor, Dr. Lish.

As a contractor for these limited services, it is understood that nothing I do, or have done, with respect to the contract establishes any kind of a physician-patient relationship between myself and any inmate, and that my role in this case does not involve either the direct or indirect provision of any kind of medical care.  All parties are aware that I do not have a license to practice medicine in Colorado, and no actions on my part can or should be misconstrued or misinterpreted as the practice of medicine. Throughout this report, I will refer to Jayde Moonshadow ("JM"; her preferred name) using female pronouns, as those were her pronoun of choice and this is the convention in clinical work with gender dysphoric patients (Brown, 1990; Ettner, et al, 2016).

## QUALIFICATIONS

I am a Professor of Psychiatry and the Associate Chairman for Veterans Affairs at the East Tennessee State University Quillen College of Medicine Department of Psychiatry. I also hold a teaching appointment related to my expertise with transgender healthcare and research at the University of North Texas, Texas College of Osteopathic Medicine, and I have current privileges to provide transgender health care and training at one Federal Bureau of Prison facility in the Dallas-Fort Worth area (Carswell). For three decades, my clinical research has focused principally on the study of transgender health, particularly with gender nonconforming adults with a diagnosis of Gender Dysphoria (GD; DSM-5)), previously known as Gender Identity Disorder (GID; DSM-IV). I have done research with, taught on, and published peer-reviewed professional publications specifically addressing incarcerated persons with GD.  I have been

EXHIBIT 2

involved in the clinical evaluation of patients with GD for approximately thirty years and I have evaluated and/or treated more than 500 patients with gender identity disorders, including approximately 15 individuals with GD who were, at the time of my evaluations, incarcerated.  I have served for more than fifteen years on the Board of Directors of the World Professional Association for Transgender Health (WPATH), and was a member of the WPATH committee that authored Version 7 of the Standards of Care, published in 2011, which is the current version. I am a Co-lead on the Version 8 Revision Committee, focusing on standards for institutionalized persons who are transgender, transsexual, or gender non-conforming.  I personally authored the section addressing the treatment of incarcerated persons suffering from GD in Versions 5, 6, and 7. I have been an active member of WPATH since 1987 without interruption and I have presented original research work on GD topics nationally and internationally in eight countries. I have been accepted as an expert on transgender health issues by numerous federal district courts, federal tax court, and Canadian courts.  I provide national training on transgender health issues, to include psychiatric, hormonal, and surgical treatments, for the Veterans Health Administration and the Department of Defense, and I have provided training for a national meeting of clinicians working in the Federal Bureau of Prisons. Finally, I have been actively involved in the development of national and state level policies for health care organizations and Departments of Correction seeking to provide transgender healthcare in ways that meet both clinical and legal requirements. A complete listing of my qualifications and experience to provide this consultation and rebuttal report is included in my CV, which is attached to this report and dated 10/31/17.


## DOCUMENTS REVIEWED FOR THIS REPORT

Medical records for JM, provided by encrypted file transfer, through December, 2017

Administrative and disciplinary records

Kite records

All plaintiff and defendant filings provided to me as of the date of this report

Initial report of Randi Ettner, PhD (7/28/17)

Second report of Randi Ettner, PhD (10/26/17)

Report of Li Brookens, LCSW (12/12/17)

Brown G: A review of clinical approaches to gender dysphoria. J. Clin Psychiatry, 51(2):57-64, 1990.

Brown G, McDuffie E: Healthcare policies addressing transgender inmates in prison systems in the United States, J Correctional Health Care, 15(4):280-291, 2009. DOI: 10.1177/1078345809340423

Brown G: Autocastration and autopenectomy as surgical self-treatment in incarcerated persons with gender identity disorder, International Journal of Transgenderism, 12(1):31-39, 2010. DOI: 10.1080/15532731003688970.

Brown G: Recommended revisions to the World Professional Association for Transgender Health's Standards of Care section on medical care for incarcerated persons with GID, Int'l J Transgenderism, 11(2):133-139, 2009.

Brown G, McDuffie E: Healthcare policies addressing transgender inmates in prison systems in the United States, Journal of Correctional Healthcare, 15(4):280-291, 2009. DOI: 10.1177/1078345809340423; online version: http://jcx.sagepub.com/cgi/content/abstract/15/4/280.

Brown G, Jones KT: Mental health and medical outcome disparities in 5135 transgender veterans receiving health care in the Veterans Health Administration: A case-control study. LGBT Health. 3(2):122-131, 2016.

Coleman E, Bockting W, Botzer M, Cohen-Kettenis P, DeCuypere G, Feldman J, Fraser L, Green J, Knudson G, Meyer WJ, Monstrey S, Adler RK, Brown GR, et al: Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People, Version 7, Int'l Journal of Transgenderism, 13:4,165-232 (2012). http://dx.doi.org/10.1080/15532739.2011.700873

Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition, American Psychiatric Publishing Inc., Washington, D.C., 2013.

Ettner R, Monstrey S, Coleman E: Principles of Transgender Medicine and Surgery, Second Edition. Routledge/Taylor and Francis, 2016.

Hembree W, Cohen-Kettenis P, Gooren L, Hannema S, Meyer W, Murad M, et al: Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline. J Clin Endo & Metabolism, jc.2017-01658, https://doi.org/10.1210/jc.2017-01658.

Levine S: Reflections on the legal battles over prisoners with gender dysphoria. J Am Acad Psychiatry Law 44:236–45, 2016.

National Commission on Correctional Health Care policy statement, October 18, 2009, available at http://www.ncchc.org/transgender-health-care-in-correctional-settings

Van de Grift T, Elaut E, Cerwenka S, Cohen-Kettenis P, et al: Effects of medical interventions on gender dysphoria and body image: a follow-up study. Psychosom Med, in press, 2017, DOI 10.1097/PSY.0000000000000465.

Dhejne C, Lichtenstein P, Boman M, Johansson ALV, La˚ngstro¨m N, et al. (2011) Long-Term Follow-Up of Transsexual Persons Undergoing Sex Reassignment Surgery: Cohort Study in Sweden. PLoS ONE 6(2): e16885. doi:10.1371/journal.pone.0016885

State of Colorado Department of Corrections Policies (multiple revisions) relevant to transgender inmates: AR 700-14; AR 850-11

Greenstein A, Plymate S, Katz P: Visually stimulated erection in castrated men. J Urology 153:650-652, 1995.

## CRIMINAL HISTORY

JM has been in the CO prison system since approximately 2004.  The original convictions were for felonies related to the sale of stolen goods at pawn shops and attempted escape from a felony conviction.  She has accumulated additional incarceration time after being convicted for attempting to kill her cellmate and for weapons charges. She was also convicted of assault on one or more corrections officers (CO's).

## PAST PSYCHIATRIC HISTORY

JM has had past psychiatric treatment, including in the state hospital system, for recurrent major depression with psychotic features and reportedly for ADHD.  She has been treated with numerous psychotropic medications since childhood, to include multiple antipsychotics (haloperidol, olanzapine, risperidone, quetiapine, thorazine) and antidepressants. Psychotic symptoms included hallucinations. I did not have access to records of her psychiatric history prior to incarceration.  She reported that she had acute dystonic reactions to risperidone, and that haloperidol probably helped her with her symptoms of hallucinations better than the other medications she was treated with. She has not been treated with antipsychotic medications for some time, and is not currently taking any medications in this class.

## RELEVANT CLINICAL SUMMARY

I conducted an examination of JM in person on 12/27/17 at the Sterling Correctional Facility near Sterling, CO, that lasted approximately 4 hours, 15 minutes, with two 5 minute breaks. We were not interrupted by staff at any time, and we were provided with a large conference table in a quiet room normally used for parole hearings.  There was no evidence that we were monitored during the interview, and it is unlikely that anyone could have overheard our discussion from adjacent rooms. I was treated respectfully and professionally by all CDOC staff I encountered.

Prior to the onset of the interview, I had completed the clinical records review and a majority of the administrative records review.  At the onset of the interview, I informed JM that I would not be entering into any kind of physician-patient relationship with her, and that the interview would occur on a single episode at the behest of the Attorney General's office, representing the Colorado DOC (CDOC).  She was aware that the interview results would be shared with her clinicians, attorneys on both sides of her

litigation, and with the CDOC. She agreed to commence the interview under these conditions of nonconfidentiality.

JM indicated she had been in prison since 1/28/04, on a 6 year conviction, with an additional 16 years added consecutively and another 5 year conviction, both for violent crimes while incarcerated. She states her release date is 2029, but that she might be eligible for release to a community corrections environment (half way house) much sooner than that.  9.5 years of her time in custody has been in units other than general population settings, including segregation involving 23-hour lock down and limited contact with other inmates or staff.  She stated this was a result of her violent behavior, "acting out" against officers (CO's) and at times other inmates. "I was pissed off at the world, at being a male, and I lashed out." Her most recent fight was on Christmas day, 2017, a few days before this interview.  She still had bumps/bruises on her face/forehead and right inner arm after fighting with another inmate who called her "a faggot."  "I defended myself—he went down." Apparently, this fight was not reported and she does not believe she will encounter any discipline from this event.  In August, 2017, she received discipline for getting more tattoos: 25 days of lost privileges and 13 days subtracted from her "good time" according to her report.

JM stated she is "half Lakota and half Spanish," identifying her father as a Native American and her mother as Spanish.  Her father did not identify with any tribal customs, traditions, or religion and was heavily involved in alcohol and drug use throughout her upbringing.  She stated that her father used to beat her regularly and knocked her unconscious hundreds of times, and tried to "kick my skull in" on more than one occasion.  There is some evidence in the records that JM was involved with the killing of pets and torturing of other animals, e.g. chickens. ███████████ ████████████████████████████████ and that she was homicidal toward her father (with a plan) while a teenager.  "He extremely sexually assaulted me." She was raised in foster care as a result of being homicidal, between ages 12 and 16, and at 18 went to live with her mother, who "evicted" her that same year due to her behavior.  At 18, she was heavily involved with alcohol and drugs and made a living as "the ho on the corner." She was robbed and shot while prostituting as a female on her own, then she got hired on as a known transwoman with an escort service where she felt she had more protection.  Her employer knew she had male genitals; her clients were usually cisgender women or transwomen, but occasionally were males. JM used makeup extensively, and felt that she could make herself up in such a way that she did not dislike her appearance in the mirror.

JM stated she was aware of not being like other boys from her earliest memories at 3-4. She does state that her memory for many things in her childhood is nonexistent or poor, but she does recall trying on her sister's dresses and, when caught, being chastised and beaten.  She preferred stereotypically female play and female friends while growing up. Due to being beaten by her father for any display of female behavior, she cross-

dressed only rarely and in secret throughout her teens.  At 18, she began living exclusively as a woman, and did so until she was arrested and jailed at about age 21.  She did not receive any formal diagnosis or treatment for Gender Dysphoria (GD), but stated she tried some birth control pills obtained illicitly on the streets, but not on any consistent basis to notice changes to her body.

After incarceration, she stated that she tried to "embrace maleness" early on, growing a moustache/goatee, and getting involved with extreme body building activities.  "I was being a bad-ass.  If I had to be a male, I'll just destroy this body."  She stated that during these years, approximately 2004-2006, she damaged her own ligaments from power lifting, broke ribs from the barbell falling on her chest, and wished the barbell would fall on her neck "to end the misery of being stuck in a male body."

JM has had frequent thoughts of autocastration (surgical self-treatment; see Brown, 2010). Over at least the last year, she says she has daily thoughts of autocastration, but she is fully aware of the elasticity of the testicular arteries and aware that she runs the risk of bleeding to death if she attempts this on her own.  In spite of that knowledge, she states that some days it is a struggle not to "cut off my junk" in an attempt to relieve her GD symptoms.  She has developed plans that include the use of ice to numb the scrotum and using a scalpel fashioned from a razor blade to make the incision, followed by use of dental floss as a ligature for the severed testicular arteries/veins.

Concerning her current psychiatric care, she indicated she was being seen by Dr. Butler via telemental health appointments, but states she has not receive psychotropic medications from her.  Records indicate that Strattera may have recently been added in December for putative ADHD, but JM did not share this information with me.

JM has accumulated significant knowledge of sex reassignment surgery (SRS; also accurately referred to as gender confirmation surgery, or GCS)in spite of long-term incarceration.  She is aware of, and owns, a copy of the WPATH Standards of Care (SOC), version 7, and knows of "Marci Brown" (sic; Bowers) as a surgeon who used to work in Trinidad, CO, and who does SRS.  She knows that the procedure is "hours long" and involves the removal of the testicles, use of the tip of the penis for a neoclitoris, and invagination of the penile skin to line a neovagina.  She is aware that electrolysis of the genital area is required before SRS.  She stated she has had access to the library and to interlibrary loan for books that have this information.

Regarding GD symptoms, JM states that the cross-sex hormone (CSH) treatments have helped only marginally but have also increased her crying (which she does not view as a problem).  She is not disappointed in the breast development she has achieved in 2.5 years of treatment, but continues to feel significant GD anxiety/depression related to facial hair growth and lack of ability to fully transition to a female appearance. CSH has caused her no side effects, by her report, and multiple positive effects:  increased hip size, breast growth (which she still experiences as painful at time, particularly in the subareolar region), some hair regrowth in her temples, emotional lability, happiness

when seeing her body develop "curves," absence of sex drive, and reduction in erections and firmness of erections.  However, she states that she still grows a significant stubble in the moustache area but hair growth on the rest of her body is "sparse."  She complains of continued occasional spontaneous partial erections that are not caused by any stimulation, and are unwanted.  She does not masturbate, and is troubled by the continued presence of erections in spite of CSH. "There's supposed to be erectile dysfunction."

I asked JM what she would like to obtain, in an ideal world, to address her GD, in addition to the CSH treatment she has already been receiving since May, 2015. Records review indicate that her initial demands by *pro se* litigation were limited to female undergarments, permanent hair removal, cross-sex hormonal treatment, and changes in CDOC policies to reflect the needs of transgender inmates. Today she stated she would like to obtain the following from litigation or settlement, and preferred that a settlement be reached (the list is not ordered in any priority):

1. Access to female canteen items, the same as any cisgender female prisoner in the CDOC system (this would include, by definition, access to female undergarments—bras and panties).

2. Nongenital surgical procedures to include rhinoplasty, Adam's apple reduction (tracheal shave), and brow reduction.

3. Changes in CDOC policies to take transwomen (and transmen) and their needs into account.

4. Genital SRS, to include vaginoplasty, clitoroplasty, penectomy/orchiectomy.

5. Laser/permanent hair removal (essentially all body hair except on the scalp and eyebrows)

6. Move to a female prison after genital SRS (although she feels she should be there now, with or without SRS).

7. Universal use of female name and pronouns by all staff/officers.

She readily acknowledged that some of these "wish list" items are not likely to occur, but is willing to exhaust all necessary legal remedies to obtain those interventions she feels most strongly about, e.g. SRS. When asked what had changed for her between her first demands in her first filing and now, she stated "I got a team of lawyers.  I didn't know what the options were.  My mom told me if I never ask for something, I won't get it.  The lawyers said I had a right to ask for this [additional] stuff."  She also stated that "If they settle and let me out, I would drop the whole lawsuit" and that she would pursue the treatments on the outside.  Other comments regarding the list above included her feeling that she could tolerate wearing boxers instead of panties, but she does not feel it to be appropriate to her gender.

**MEDICAL NECESSITY**

JM was queried regarding her views of the medical necessity of the interventions she has requested. Her definition of medical necessity is: "So necessary as to be life-affirming or life-saving. In my case if I'm not a woman my life is moot."  Given her definition, she rated genital SRS as the most important medically necessary intervention.  "I would say also electrolysis, but I don't think anyone else will agree with me.  And without policy changes, there is no progress." When queried further regarding hair removal, she focused mostly on the upper lip area of her face as the most problematic for her, and also stated that she did not consider laser electrolysis or other forms of permanent hair removal to her body as medically necessary, accurately pointing out that her body hair is quite "sparse".  "I have palpable [moustache] stubble by 8pm…I have disgust and revulsion by seeing stubble.  I break down and cry about it." With respect to the other surgeries, JM stated that they "could potentially be medically necessary" but she was aware that most people would not view the brow surgery, rhinoplasty, and tracheal shave as medically necessary.  Finally, regarding underwear, she believes the bras are medically necessary but that panties, in her particular case, may not be.  "I personally can wear boxers, I'm not going to kill myself over it."

JM reported that she did not want to look like her father, the man who violently abused her over many years.  She stated that when she is thinner, she looks much more like him, which upsets her greatly.  "My nose and my brow are what make me look like my father." The primary motivation for changing her facial appearance was to avoid looking like her father and not to make her face appear more feminine.

**SUICIDALITY AND AUTOCASTRATION IDEATION**

The hallmarks of the designation of "severe" as a modifier in the severity of the diagnosis of GD are suicidality and/or the presence of intrusive thoughts of performing autocastration and/or autopenectomy (see Brown, 2009; 2010), with autocastration understood as surgical self-treatment and not as a "mutilation" or a suicide attempt.  JM reported persistent thoughts of autocastration due to severe GD, and has thought through a detailed plan on how she could accomplish this in her cell, using ice to number the scrotum, a razor blade and dental floss as suture material. She has accurate knowledge of the elasticity of the testicular arteries and would worry that her dental floss ligatures would not hold and that she would therefore bleed to death.  She has "daily" thoughts of this plan, but does not want to die while she still has a chance at being a woman.  She does not think she would survive the pain and bleeding of surgical self-treatment. "I don't want to *die*, but I want to *live* as a woman.  If forced to live as a man I'll rustle up drugs on the yard, speed, heroine, and get a jailhouse rig."  She has had multiple past suicide attempts related to her GD symptoms as noted above.  She has given herself a three year window in which to fully transition, either inside or outside of prison in a community placement.  She stated at the end of that time, if it did not appear that she was going to fully transition (to include especially genital SRS) that she

would terminate her life as a man by suicide and hope for a female existence after leaving this life. She believes in reincarnation and that she would "come back as a sentient being."  Although she views herself now as a Wiccan (previously raised as Roman Catholic) and is aware that suicide is not viewed favorably in her belief system, "it wouldn't stop me from committing suicide." It should be noted that her reports to me regarding the severity of her autocastration thoughts and the level of intrusiveness of these thoughts do not appear prominently in the medical records or to have been regularly shared with her mental health care providers.  It is unclear whether the severity of her symptoms has actually increased since the filing of her lawsuit, or whether the dynamics and process of the lawsuit have impacted her reporting of these symptoms to outside evaluators.

**PLACEMENT**

JM states she fears being assaulted "every day."  She described a number of assaults at the hands of other inmates while incarcerated, some of which were sexual assaults/rapes, and others were fights, most recently a few days before this interview. She feels that she would be substantially safer in a women's prison, and would prefer to be there immediately, with or without SRS.  She is confident that she would be moved to the female facility if she obtained SRS, but does not believe that surgery should be necessary.  She does not know if she would be abused by female inmates or the CO's in the female prison, but is willing to take the risk given her experiences in a male prison.  She stated she is exclusively attracted to women (cisgender and transgender), and not to men, but that she has no current sex drive or interest.

**LABORATORY DATA RELEVANT TO CROSS-SEX HORMONAL TREATMENT**

JM has had a number of blood tests over time as part of her CSH safety monitoring. Records indicate recent lab assessments as follows:

1/20/17: Estrodiol 161 pg/ml; Testosterone <3; Prolactin 11

6/22/17: Estrodiol 89 pg/ml; Testosterone 18; Prolactin 21

7/27/17: Estrodiol 304 pg/ml; Testosterone 573; Prolactin 43

11/2/17: Estrodiol 216 pg/ml; Testosterone 312; Prolactin 29

Serum potassium levels (relevant due to spironolactone use) have all been normal.  Hct and Hb levels have decreased from pre-CSH baselines, which is consistent with reductions in serum testosterone levels.

On 11/3/17, Dr. Butler documented that the lab values above are inconsistent with stable dosing of CSH taken as prescribed, an assessment with which I totally concur. The first two sets are consistent with adequate dosing, assuming the clinical response expected is present.  The third set is either laboratory error (usually not the case) or potentially indicative of taking higher doses of estrogen than prescribed and possibly less spironolactone than prescribed.  In any event, the sequence of laboratory testing is

not consistent with stable dosing and administration of estradiol and spironolactone.  Dr. Butler has indicated in a note on 12/18/17 that JM was not taking CSH "for a couple months" and then took "too much" thereafter.  On 12/19/17, Dr. Butler changed the dosing of estradiol to 4mg po bid (total dose, 8mg a day), up from 6 mg total dose a day.  Spironolactone remains the same at 100mg twice a day.  Follow up labs are to be drawn on 2/19/18.

JM stated in my interview that she had a 3 month period during which she was grieving the loss of her sister and during which she did not take CSH.  She is allowed to have both estrogen and spironolactone in her personal possession and take them as she wishes, unmonitored.  She has to stand in a long medication line for other medications, however, such as prazosin. She stated that she was "trying not to implode" after the death of her sister in 2017, and that at other times separate from that 3 month period of noncompliance, she has taken the CSH doses regularly with few missed doses.


**MENTAL STATUS EXAM**

JM was interviewed without any barriers or restraints on her of any kind in a large conference room. She was wearing loose-fitting green prison garb with a white tee-shirt underneath.  She stated she was also wearing a sports bra, and showed me the gray shoulder strap associated with that garment. She had dark, mostly straight, brown hair that was about 8 inches below the shoulders and worn in a feminine pony-tail style. She did not bring anything with her to the interview. Fingernails were short and well cared for.  Her glasses were stereotypically feminine in appearance, and bright pink in color. Her overall mannerisms and gesticulations, including gait, were not stereotypically feminine and did not suggest an exaggerated effort at presenting in the female gender role.  She was wearing heavy eyebrow makeup, liner and shadow, which she stated she made herself and sometimes wears in spite of the potential risk of receiving a disciplinary report.  She had no apparent "Adam's apple", either in the frontal view or the side view. A noticeable dark hair shadow was noted over her upper lip, but not elsewhere.

She had a large, blue-black tattoo on her left inner arm (a rose) and forearm (" Pure Dyke").  A smaller dark tattoo was noted on her left hand, "TG Woman" as well as a "617" tattoo on her right inner calf (signifying some affiliation similar to a gang, by her report).  She reported chronic, untreated psychotic symptoms to include two kinds of auditory hallucinations.  The first is of voices outside of her head, of voices she does not recognize and which are "annoying." She admits to having this experience since late childhood, and at least 6 times in the last year. The second type of hallucinations are voices inside her head involving an ego-dystonic female voice on a daily basis that she interprets as the "darker part of myself."  This is a very disturbing voice for her, taunting her to harm herself or be violent, telling her "you will never be a woman."  This voice scares her and she tries to distract herself by reading and listening to music.  She

struggles not to "embrace the dark side of myself—violent, destructive."  Haldol helped relieve these symptoms in the past "to a degree, but I was a Zombie the next day." "Walking Dead is a TV show, not a lifestyle." She denied visual or tactile hallucinations, delusions, ideas of reference, racing thoughts.  Her weight is stable between 160 and 185 pounds, and she stated she makes a conscious effort to avoid low weights, as that is when she looks most like her father.  Her appetite is good, and anhedonia was absent.  She described her mood as "all right, a better day" and her mood was euthymic.  Cognitive functioning was grossly intact, although she reported memory disturbances for much of her younger life that could not be tested in this exam setting.  Memory for other elements of her history and for some recent events was intact, but memory disturbance could not be ruled out on clinical exam.  She was able to name 14 fruits in one minute and perform serial sevens without too much difficulty.  She reported ongoing paranoid ideation—"in prison, absolutely"—citing that she has been raped 4 times and has to be extremely wary.  She did not feel that she was singled out by prison staff for abuse, but noted that one female CO purposefully misgenders her and calls her by male pronouns to deny her female identity.  JM was able to abstract standard proverbs, and she displayed insight into her current situation.  She stated she spends a lot of time analyzing her own feelings and tried to understand connections, a kind of "self-therapy." Judgment for hypothetical situations and for the interview setting was good.  She denied current suicidality, but reported frequent and ongoing suicidal ideation throughout her life, including before incarceration.  She showed me a number of scars on her left inner wrist/hand that were the result of previous suicide attempts.  She stated she had overdosed and tried to drink herself to death in the past as well.  When asked why she has not been successful at ending her own life, she stated "The Goddess must have plans for me."  She denied cutting behaviors at any time, unrelated to suicide attempts. JM reported frequent nightmares related to past abuse experiences, as well as flashbacks while awake and poor sleep.


**DIAGNOSTIC ASSESSMENT (DSM-5):**

302.85 Gender Dysphoria, severe, partially treated
301.7   Antisocial Personality Disorder by history
301.8   Post-traumatic Stress Disorder is more likely than not present, based
        on past sexual and physical abuse
298.9   Other Psychotic Disorder, characterized by persistent auditory hallucinations but
        not meeting criteria for a specific psychotic disorder


**REBUTTAL DISCUSSION:**

**Diagnoses:**

  1.  JM clearly has a diagnosis of Gender Dysphoria, as noted by numerous
      evaluators who have seen her before this interview, including both plaintiff

experts.  I concur with this diagnosis, and further note that the severity of her diagnosis is severe and partially treated. The rating of her diagnosis as "severe" as described herein, is predominantly based on JM's self-report, and there is always a possibility of exaggeration of symptoms in an incarceration environment. In my personal discussion with Dr. Butler prior to writing this report, it was noted that JM has not presented the same level of severity of symptoms of Gender Dysphoria in her sessions with JM. Taking all of this into account, I do not believe the diagnosis of Gender Dysphoria is in question.  Partial treatment with CSH for over 2 years, in spite of JM's self-imposed interruption in treatment for up to 3 months of that time, has resulted in some improvements in her core symptoms.  However, she reports that her overall improvement has been a decrease in severity (on a scale of 1-10, where 10 is the worst, 1 is the best) from "10+" prior to CSH treatment to 10 at six months, 8 at one year, and 6-7 today (the lowest level it has been).  "But every time I look down and see [my genitals] I'm right back to 10+, every time I get an erection I'm maxed out to 10+ again."  It is uncommon, in my experience, for patients with very low levels of testosterone to continue to experience spontaneous erections, but it is not unheard of.  For example, fully 25% of castrated men were objectively assessed to achieve firm erections with minimal testosterone levels in a study of prostate cancer treated men (Greenstein, et al, 1995).  Understandably, patients with GD experience substantial increases in symptoms when erections occur.  Specifically, the symptom of genital dysphoria is most severe in JM, and spontaneous erections are highly problematic as a result (Dr. Butler recently increased the dose of estrogen to 8mg total dose a day, but it is too early as of this writing to assess the clinical response of this change; laboratory values are pending for 2/19/18). Patients with milder forms of GD may be adequately treated with counselling/psychotherapy and CSH, but those with the more severe forms of this disorder (characterized by GD-related suicidality and intrusive thoughts of autocastration/autopenectomy) are not adequately treated by these modalities alone.

2. Although Ms. Brookens indicates that the records show that personality disorder diagnoses are dropped from JM's diagnoses in the later years of her incarceration, in my experience, a resolution of a significant personality disorder completely is generally not seen, especially in the absence of treatment for same.  In my view, antisocial personality disorder is still present currently, with its antecedents documented in childhood and adolescence.  She does appear to have some degree of potential for empathy as demonstrated in her inclusion of other trans inmates in her litigation, but she is quick to point out that as much as she has concerns for her "sisters," if she could get a reasonable settlement that was limited to her alone she would quickly accept that offer. I would concur that in the controlled environment of the prison setting, her expression of antisocial personality disorder is diminished and that this diagnosis is not a current focus of problematic behavior or treatment.

3. Post-traumatic stress disorder is a common comorbid diagnosis associated with GD as noted by Dr. Ettner and in my own original research work on these disorders (see Brown and Jones, 2016). Transgender children/adolescents are frequently the target of physical and sexual abuse by family and nonfamily perpetrators.  Such is the case for JM, and she has both nightmares as well as daytime flashbacks of previous abuse episodes.  She wishes to change her facial appearance surgically, more as a way to avoid looking like her father in the mirror than as a way to feminize her features. This is a trauma-based motivation for requesting surgery on her face.

4. JM reported to me two specific types of auditory hallucinations dating to childhood which were previously treated with some degree of reported success. Ms. Brookens also noted the presence of auditory hallucinations, although she did not go into much detail on these symptoms.  Dr. Ettner did not report the presence of these symptoms in her reports. JM has previously been diagnosed with Delusional Disorder (Paranoid). It is not possible to assess the history of these symptoms further in the absence of pre-incarceration psychiatric records, however they both remain active and untreated, based on my interview with JM. Most troublesome, and clinically significant, are the ego-dystonic, degrading voices inside her head that may be involved in violent behavior towards self and others, with the predominant risk likely to be harm to self as demonstrated in multiple past suicide attempts. It is unclear whether these hallucinations were in any way involved with the multiple incidents of violence towards others since incarceration.  No other classic symptoms of specific psychotic disorders are persistently present, for example delusions, or paranoia that is out of proportion to her dangerous surroundings. This disorder could potentially be traced to the numerous traumatic brain injuries that JM has reportedly endured at the hands of her father prior to the onset of these symptoms, as it is atypical to have persistent auditory hallucinations in the absence of other symptoms associated with schizophrenia spectrum disorder, psychotic depression (there is no evidence of current major depressive disorder with psychosis, although this has been a past diagnosis).  There are no brain imaging studies for my review, and such studies may not render information in making this connection in any event. It should be noted that in spite of many mental health visits over many years, JM does not appear to have discussed these symptoms at any length with her mental health care providers. I verified this in a personal discussion with Dr. Butler, her treating psychiatrist. She has not sought treatment recently for these hallucination symptoms, and she is not requesting treatment for these symptoms in my interview with her. It is not uncommon for patients with more circumscribed, chronic hallucinations to be selective in when and with whom they share these experiences. Finally, I do not believe that these hallucinations are related in any way to the diagnosis of Gender Dysphoria.

**Treatment Recommendations:**

Many psychiatric diagnoses predominantly involve patient self-report regarding the presence of symptoms and their subjective levels of severity, as well as response to treatment.  The following discussion of treatment recommendations works from the assumption that JM's symptoms and their severity (as reported to me) and corroboration with the records, when possible, are accurate.

Plaintiff experts conclude their evaluations with similar lists of recommended treatments that they deem medically necessary (or imply medical necessity when not specifically stated) to include: 1. CSH 2. Facial feminizing surgery (type/location not specified by either expert) 3. "permanent means of hair removal" (location unspecified by Dr. Ettner; face and genital area specified by Ms. Brookens) 4. "access to items and clothing available to female inmates" (Dr. Ettner; Ms. Brookens is less specific and global, stating only "gender affirming clothing") and 5. Genital surgical treatment (SRS). Neither expert recommends any psychiatric or psychological treatment for GD or for any other serious mental disorder.  I will comment on each of these similar sets of recommendations, but my first divergence from plaintiff experts is on the need for psychiatric treatment, and that issue will be addressed first.

JM has a current, chronic, untreated psychotic disorder as noted above that merits further exploration and treatment, assuming she voluntarily wishes to proceed with treatment.  Neither plaintiff experts recommend treatment for this diagnosis; Ms. Li believes that the symptoms are not of sufficient severity to warrant treatment, a conclusion with which I do not concur.  Dr. Ettner did not make a diagnosis of any psychotic disorder, but she did recommend that "co-occurring conditions" be adequately treated. JM has been treated for psychotic symptoms, and disorders, in the past, and there is evidence that antipsychotic medication, most likely in doses lower than those traditionally used for schizophrenia, has been helpful.  Side effect management or avoidance will be critical in medication selection.  It is my recommendation that her current psychiatrist review this information and consider treatment collaboratively with JM.

With respect to treating JM's Gender Dysphoria diagnosis, there are areas of concurrence and divergence between my recommendations and those of plaintiff's experts.  Similar to the recommendations of Dr. Ettner and Ms. Brookens, my recommendations below take into account the WPATH Standards of Care, version 7, as flexibly applied to inmates and to those not in a corrections environment, and as applied in an individualized context for JM. WPATH SOC Version 7 is clear on the issue as to whether or not incarcerated persons should be considered for medically necessary care, including genital SRS, using these criteria (Section XIV):

> "The [Standards of Care] in their entirety apply to all transsexual, transgender and gender nonconforming people, irrespective of their housing situation.  People should not be discriminated against in their access to

appropriate health care based on where they live, including institutional environments, such as prisons…(Brown, 2009). Health care for transsexual, transgender, and gender nonconforming people living in an institutional environment should mirror that which would be available to them if they were living in a non-institutional setting within the same community.  All elements of assessment and treatment as described in the SOC can be provided to people living in institutions (Brown, 2009).  Access to these medically necessary treatments should not be denied on the basis of institutionalization or housing arrangements.  If the in-house expertise of health professionals in the direct or indirect employ of the institution does not exist to assess and/or treat people with gender dysphoria, it is appropriate to obtain outside consultation from professionals who are knowledgeable about this specialized area of health care… People with gender dysphoria who are deemed appropriate for hormone therapy should be started on such therapy… The lack of initiation of hormone therapy when medically necessary includes a high likelihood of negative outcomes such as surgical self-treatment by autocastration, depressed mood, dysphoria, and/or suicidality."

NCCHC has also published a recent guideline that may be illustrative here, as it relates to the provision of medically necessary health care for gender dysphoric inmates, supportive of the statement above.  Therefore, by both of these guidelines, there is no bar to considering JM for the full range of medically necessary treatments as applied through an individualized treatment plan specific to her case.

Addressing plaintiff experts' list of treatment recommendations in order:

1. Cross-sex hormones: I concur that continuing access to cross-sex hormones in the form of estrogen treatment and testosterone receptor blockade is medically necessary treatment for JM. CSH should not be interrupted. The dose of estrogen has been partially effective at reducing her symptoms. It is unclear if she is understating the benefits that she has received from CSH to date, as most patients I have seen seem to benefit somewhat more from appropriately dosed CSH treatment.  Understating benefits can sometimes lead to the prescribing of higher than necessary doses of estrogen, in particular, that increase the potential for side effects without substantially increasing the likelihood of additional benefits.  Target blood levels for appropriate treatment as well as ongoing laboratory monitoring are well described in the 2017 publication cited in the references at the beginning of this report (Embree, et al, Endocrine Society Guidelines, 2017). This recommendation is consistent with the opinions of plaintiff's experts. I concur with Dr. Ettner's additional recommendation regarding the physical aspects of medical monitoring, which go beyond just laboratory

assessments, following the guidance in guidelines referenced earlier (Hembree, et al, 2017)

2.  Facial feminization surgeries: Although neither plaintiff expert goes into detail on the various surgeries subsumed under this overarching term, with respect to JM, the relevant surgeries requested include brow surgery, tracheal shave, and rhinoplasty.  There are many other surgeries that fall under this general descriptive term, but these are the three specific procedures discussed with me by JM. One or more of these procedures may well be medically necessary for the treatment of GD in some patients, but I do not believe that is the case here, especially given the non-gender dysphoria related rationale for requesting facial surgery. It is also the case that appropriate makeup was found to be very helpful for JM prior to incarceration and she was able to reach a reasonable accommodation with her appearance under those conditions.  Those conditions are not being replicated in the prison environment, as she does not have access to standard canteen items available to cisgender female inmates.  Finally, a physical exam of JM's neck reveals that she does not have a visible "Adam's Apple" with an appearance that varies from most cisgender females of her body weight.  It is possible that it might be more prominent if she were to lose a lot of body weight, but she has made it clear that she has no intentions of doing that. For those reasons, I do not agree that any of these three procedures are medically necessary for the treatment of GD in JM's case. Finally, it is notable that Dr. Ettner recommended facial feminization surgery in her first assessment, which did not include a face-to-face interview, but she did not include this as a medically necessary intervention in the conclusions in her second report, after she had benefit of a personal interview with JM.

3.  Hair removal: Dr. Ettner does not specify the extent of recommended electrolysis, and Ms. Brookens mentions the face and genital area, correctly pointing out that genital hair removal is usually a requirement prior to genital SRS due to the physical realities of the penile inversion technique, the most commonly performed surgery for transitioning birth sex males (Ettner et al, 2016). JM, however, is requesting whole-body electrolysis exclusive of the scalp and eyebrows, as related to me in my interview. Hair removal, like facial surgery, is a very individualized determination regarding medical necessity and varies greatly from one individual to another. JM correctly notes that she has fairly sparse hair on her body, based on her particular genetic makeup. Having said that, it is clear that she has substantial upper lip/moustache hair that is quite dark and does cause an increase in symptoms of GD. Permanent hair removal on the upper lip/moustache area is medically necessary and can most likely be achieved through repeated thermal, electrolytic, or a hybrid laser/electrolysis approach. It

16

is my opinion that electrolysis in other areas, other than that which would be required as preliminary to SRS (should that treatment be offered), is not medically necessary.

4. Gender-affirming clothing and access to female canteen items: Access to female undergarments (bras, in particular) makes good clinical sense for a transwoman who has developed breasts.  I concur with plaintiff experts in that JM should have access to the same bras and the same number of bras as any other female inmate housed by CDOC. Other DOC's allow for more open access to female commissary items for transwomen housed on male units. This wider access may have legitimate security implications which need to be addressed, and I am not an expert on classification and security.  Having said that, I have been involved in many cases in other DOC's where "security concerns" were inappropriately utilized as a pretense to block access to one or more medically necessary interventions for inmates with GD.  If it is legitimately concluded that JM cannot be housed on a female unit, it is my opinion that it is medically necessary and clinically appropriate for her to have access to female undergarments just as any other similarly incarcerated woman in CDOC. It is clinically indicated for her to have access to the same commissary items as any other woman in CDOC: no more, and no less. Outside of female undergarments, I do not believe access to the female commissary is otherwise an issue of medical necessity per se.

5. SRS/Genital Surgical Treatment: The question of whether SRS is indicated for JM is less straightforward. Both plaintiff experts opine that SRS is not only medically necessary for JM, but that this treatment is indicated *at this time* in her treatment. The medical record is largely absent for the presence of reporting of severe symptoms of GD prior to the establishment of the lawsuit and the involvement of 3 outside experts. Having said that, the question of the appropriateness of referral for SRS should be approached from both the WPATH SOC Version 7 guidelines, given the strong medical and legal position of the WPATH SOC in similar cases nationwide.  According to the WPATH SOC Version 7, the eligibility criteria for genital SRS are:

1. Persistent, well-documented gender dysphoria diagnosis (currently met)

2. Capacity to make a fully informed decision and to give consent for treatment (currently met)

3. Age of majority in a given country (USA; currently met)

4. if significant medical or mental health concerns are present, they must be well-controlled (currently not met)

5. Twelve continuous months of hormone therapy as appropriate to the patient's gender goals (currently met)

17

      6. Twelve continuous months of living in a gender role that is congruent with their gender identity (formerly called the "real life experience;" arguably met)

JM clearly meets or exceeds 4 of the 6 criteria (1, 2, 3, and 5). Regarding criterion 6, if one accepts the position that has been accepted by WPATH and US Federal District Courts (e.g., Kosilek II, 2012) that criterion 6 can be met in a prison setting. I have previously argued persuasively to courts that this criterion can, and has been, met by transwomen in male prisons. The male prison setting, not due to any choice on the part of transwomen inmates, IS their "real life" and inmates can do the best they can to present themselves in a gender role (female) that is congruent with their gender identity (feminine) subject to the limitations of the setting. Analogously, transwomen military troops can and do complete an acceptable real life experience equivalent even though they are not allowed to cross-live or present themselves as women while on duty. JM, consistently, for many years, has presented herself and declared herself to be female in her interactions with corrections staff and other inmates as well as previously living full time as a woman prior to incarceration between 18 and 21 years of age (self-reported, unable to confirm). In spite of the fact that she has not been accepted by most staff in this role, it is still the case that she has consistently and persistently presented herself as female, often to great risk to her liberty and safety. She wears female underwear to the extent allowed. Her haircut and eyeglasses are feminine. She has tattooed her body with female gender-affirming, permanent tattoos. Given the option, she would further transition in objective ways, including wearing female outerwear and being housed with women as her stated preference. It concerns me that JM has not done the work to change her name/identity documents, although there appear to be some complications to accomplishing this in CDOC (but not likely insurmountable barriers). Changes to identity documents and name are not mandatory, but it is almost always the case that when I recommend or refer for genital SRS that patients have completed these identity document changes. JM would be less likely to be referred to by a male name if she has done what is necessary to change her legal name.

Therefore, consistent with the WPATH SOC and my personal experience with transfemale inmates, JM meets criterion 6 above. A good synopsis of the expectations of the "real life experience" equivalent can be found in Ettner, et al, chapter 14, page 253. A summary of that section is that CSH for a year or more and other activities that JM has engaged in clearly meet the intent of the "experience of living in an identity-congruent gender role." She has arguably completed as much living in the preferred female gender as this prison has allowed (separate from identity document changes).

The only eligibility criterion that is open to any serious debate is whether or not JM has had her significant mental health concerns "well-controlled" at this time. Both plaintiff experts argue that this criterion is met, a conclusion with which I disagree. Although the intent of "well-controlled" is not "cured" or "nonexistent" as some have mistakenly misinterpreted this criterion as applied to prisoners, it is the case that active psychotic disorders or other major psychiatric diagnoses that are active and untreated or partially

treated may interfere with the intent of this criterion. It is clear that JM has demonstrated highly disturbed, destructive behaviors that are well-delineated in the records, both directed at others and toward herself. She remains at chronic risk of self-harm, particularly as relates to receiving at least some of the demands in her litigation, as she does not view life in a male body as an acceptable long term situation. Her objective behavior can be described as "well-controlled" for a number of months with respect to both PTSD and Antisocial Personality Disorder (ASPD) for a number of months, if one believes the self-reporting of events of the Christmas, 2017 fight (no records are available, and possibly none exist for this episode) as purely a self-defense scenario. Given that most psychiatrists would agree that there is no known effective treatment for antisocial personality disorder or the other diagnostic terms that have been applied to this condition (e.g. sociopathy, psychopathy), one could take the position that it is a moot point to consider anyone with ASPD as ever eligible for SRS by a matter of definition. Taking this position would make ASPD a *de facto* absolute contraindication to SRS, and that is clearly not the case. Even schizophrenia, when well-controlled, is not an absolute contraindication to SRS. Having been involved in the development of the WPATH SOC for 3 versions continuously over the last 20 years, I can confidently state that there has not been any intent to make any specific psychiatric diagnosis an absolute contraindication to SRS, hence the term "well-controlled" rather than "nonexistent" or "cured."

In my opinion, JM does not currently meet all eligibility criteria for genital SRS due to the presence of an untreated psychotic disorder as noted in the diagnostic discussion above. However, it is possible that JM would meet criteria for referral for medically necessary genital SRS after her psychotic disorder becomes "well-controlled" per the guidelines, and as determined by her treating psychiatrist. Although changes to identity documents are not mandatory, these changes generally are associated with patients who are committed to irreversible genital surgery and full transition. I do not believe, however, that SRS will resolve her long-standing atypical psychotic disorder, PTSD, or Antisocial Personality Disorder issues. Ms. Brookens appears to agree that SRS is not a panacea for the serious, non-GD diagnoses that JM struggles with, particularly those related to trauma. SRS is not a treatment designed to address those significant, lifelong problems. It is a strong possibility that in JM's case a significant reduction, or resolution, in GD symptoms could occur through the combination of the treatments recommended above. It is not likely that a treatment plan that excludes genital SRS, once she is eligible, would be legally or medically "adequate care" in my opinion, taking into account her individualized treatment needs.

Although not mentioned by either plaintiff expert, it is also my opinion that JM would benefit from psychotherapy, ideally to be provided by a clinician with training and experience in gender dysphoria management, or at least directly supervised by such an individual (see WPATH SOC, Coleman, et al, 2012). The therapist should also be skilled in the complexities of working with patients with comorbid disorders such as those present in this case. I believe psychotherapy is medically necessary in the case

of JM. She is likely to benefit from a transgender support group, and it is my understanding that CDOC has such a group available, but it is located in another area of the facility.

I reserve the right to supplement, amend, or modify this report and/or its conclusions based on information of any type that may become available to me at any time after the submission of this report.


Respectfully submitted,

George R. Brown, MD, DFAPA
Professor of Psychiatry
East Tennessee State University